UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X     <u>For Online Publication Only</u>

EDSON MAITLAND,


                              Plaintiff,

                                                                  <u>**MEMORANDUM & ORDER**</u>
              -against-                                           09-CV-1675 (JMA) (AKT)

KONICA MINOLTA BUSINESS
SOLUTIONS U.S.A. INC.,

                              Defendant.                          **FILED**
                                                                  **CLERK**
------------------------------------------------------------X     1/25/2016 3:09 pm

                                                                  **U.S. DISTRICT COURT**
                                                                  **EASTERN DISTRICT OF NEW YORK**
                                                                  **LONG ISLAND OFFICE**

**APPEARANCES:**

Edson Maitland
          *Plaintiff*, *pro se*

Mitchell Boyarsky
Gibbons P.C.
One Pennsylvania Plaza
37th Floor
New York, NY 10119-3701
          *Attorney for Defendant*

**AZRACK, United States District Judge:**

Plaintiff Edson Maitland ("Maitland"), *pro se*, brings this action against his former

employer and defendant Konica Minolta Business Solutions ("KMBS"), alleging claims for

discrimination and retaliation. Maitland's claims include (1) race discrimination under Title VII

of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e <u>et</u> <u>seq.</u>; (2) age discrimination

under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 <u>et</u> <u>seq.</u>; (3)

disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101

<u>et</u> <u>seq.</u>; (4) interference of rights under the Family Medical Leave Act ("FMLA"); (5) retaliatory

discharge under the FMLA; and (6) race, age, disability, and reprisal under the New York State

Human Rights Law ("NYSHRL"), Executive Law §§ 296, 297.  KMBS has moved for summary

judgment on all claims.  For the reasons stated below, defendant's motion for summary judgment

is granted and plaintiff's claims are dismissed.

## I.  Background

The following fact are drawn from the parties' Local Civil Rule 56.1 Statements, the

declarations, exhibits, and testimony referenced therein, and any additional statements of

material facts provided in the parties' briefings.[1]  These facts are undisputed unless otherwise

noted.

Maitland is an African-American man over age forty who suffers from bipolar disorder.

(Pl. Aff. Opp'n Def. KMBS Summ. J. Mot. ("Maitland Aff.") ¶ 1.)  KMBS is in the document

management technology business; its products and services include, *inter alia*, production print

systems.  (Def.'s Rule 56.1 Statement ¶ 2, ECF No. 153.2.)

In May 2002, KMBS hired Maitland as a Service Technician.  (Id. ¶ 3.)  Anthony Marra

("Marra"), the Branch Technical Manager at KMBS's Melville Branch, approved the decision to

hire Maitland and became one of his supervisors.  (Id. ¶¶ 9, 11.)  In August 2008, KMBS

terminated Maitland as part of a reduction in force ("RIF").  KBMS maintains that Maitland was

terminated because of his poor performance in 2008.  Prior to 2008, KMBS had begun to

criticize Maitland's performance.

Maitland alleges that KBMS terminated him because of his race, age, and disability.  He

also alleges that during his employment, in 2007 and 2008, KBMS subjected him to various

---

[1] KMBS argued in its opening brief that the Court should not consider Maitland's Rule 56.1 Counter-Statement because he failed to timely respond to KMBS's statement, pursuant to the Court's Order.  (Order Granting Mot. Ext. Time, ECF No. 122.)  While Maitland may be more experienced than the average *pro se* litigant, for the sake of completeness, the Court acts within its discretion to consider Maitland's submissions as part of its determination on this motion.  For convenience, the Court cites to paragraphs in Defendant's Rule 56.1 Statement where those paragraphs are supported by the cited evidence and are not contradicted by any evidence in the record.

adverse employment actions because of his race, including: excessive scrutiny, issuance of disciplinary letters, denial of a company vehicle, denial of vacation, and failure to increase his salary. Plaintiff also complains that KMBS improperly denied him FMLA leave in August 2008.

### A. Maitland's Work at Long Island Jewish Medical Center and Reassignment to a New Territory

When Maitland was first hired, he serviced Long Island Jewish Medical Center ("LIJ") and performed well. (Def.'s Rule 56.1 Statement ¶ 24.) However, KMBS stopped servicing LIJ around December 2005 and reassigned Maitland to a new service territory that required him to drive to different customer locations. (Id. ¶ 29.) KMBS asserts that Maitland's performance declined after he began servicing this new and expanded territory in December 2005. (Id. ¶ 31.)

### B. Maitland's 2006 Medical Leave

Plaintiff took FMLA leave in September 2006, after an incident during a scheduled vacation to Florida and subsequent hospitalization. (Def.'s Rule 56.1 Statement ¶ 40.) While in Florida, Maitland was arrested by state police on various charges. (Id. ¶ 33.) He was admitted to the hospital for treatment of his bipolar disorder, and the hospital records note he had allegedly been off any medication and symptom-free since 2000. (Dep. Edson Maitland ("Maitland Dep.") at 275, 153.3, Ex. No 7.) As a result, Maitland requested a leave of absence, telling Marra he was sick. (Def.'s Rule 56.1 Statement ¶ 34; Maitland Dep. at 276.) He began his leave in September and returned in November 2006. (Def.'s Rule 56.1 Statement ¶ 35.)

Maitland communicated with the Human Resources Department regarding his leave. (Id. ¶ 36.) In Maitland's written correspondence, the cause of his absence is listed simply as "disability"; mental illness is not mentioned. (Id. ¶ 37; Letter Rita Beavis to Edson Maitland, ECF No. 153.12, Ex. No. 17.) However, Maitland's wife, Yvonne, orally informed Marra that

Maitland suffered from bipolar disorder.[2]  (Dep. Yvonne Maitland ("Yvonne Dep.") at 82–83, ECF No. 153.12, Ex. No. 17.)

Maitland testified he did not have any difficulty obtaining leave and did not experience any mistreatment or retaliation upon returning to work in November 2006.  (Defendant's Rule 56.1 Statement ¶ 40; Maitland Dep. at 276–77.)

### C.  Maitland's Alleged Poor Performance in 2006, 2007, and 2008

KMBS measures the performance of its Service Technicians in several categories: "number of calls per day; first time fix percentage; mean copies between failures; scanning percentages and effective job time."  (Aff. Gerard Giarratana ("Giarratana Aff.") ¶ 7, ECF No. 153.3, Ex. No. 47.)  These categories measure, *inter alia*, how often a technician diagnoses and fixes a problem on a first visit; how many copies a machine successfully produces between technician visits; how long it takes for a technician to travel between sites; and how often a technician complies with the requirement that he scan machines upon arrival and departure from a visit.  (Id. ¶¶ 8–11.)  Service technicians are also ranked for their technical expertise from lowest to highest: associate, professional, master, to expert.  (Id. ¶ 12.) Throughout his employment, Maitland was classified at the "associate" level.  (Def.'s Rule 56.1 Statement ¶ 22.)

In December 2006, KMBS issued a 30/60/90 Day Action Plan ("Action Plan") to ensure Maitland was properly routing calls and reducing the amount of time between calls.  (Id. ¶ 41; 30/60/90 Day Action Plan dated Dec. 15, 2006 ("Action Plan"), ECF No. 153.3, Ex. No. 18.)  Marra also suspected that Maitland was not working a full day.  (Def.'s Rule 56.1 Statement ¶ 41.)  By March 2007, Maitland had improved his effective job time percentage, but did not increase his number of completed calls per day.  (Id. ¶ 42; Action Plan.)

---

[2] Yvonne testified: "[Marra] was asking me what happened in Florida. . . . I said to him, I think it's something with his bipolar. . . . [I]t's a kind of like a mental kind of illness where he gets depressed."  (Yvonne Dep. at 82–83.)

KMBS conducted performance reviews for its technicians in 2007. (Def.'s Rule 56.1 Statement ¶ 43.) Around July, Maitland was among the three technicians who received the second lowest possible performance ranking: At Expectations Minus ("AE-"). (Id.; Salary Review Confirmation Form dated July 2, 2007, ECF No. 153.3, Ex. No. 19.) Later that year, in October, Marra denied Maitland's request to use a company vehicle, although Maitland's own car was not working. (Marra Statement ¶ 6.)

In April 2008, KMBS issued Maitland a performance improvement plan ("PIP") and Steve Goldstein ("Goldstein"), the new group leader, met with Maitland to discuss it. (Def.'s Rule 56.1 Statement ¶¶ 45–46.) The PIP—signed and dated by Maitland—listed specific improvement goals for training, first-time fix percentage, effective job time percentage, mean copies between failure percentage, scanning percentage, and completed calls per day. (Id. ¶ 49; Technician Performance Goals Development dated Apr. 30, 2008 ("PIP"), ECF No. 153.3, Ex. No. 21.) Maitland's performance temporarily improved for the first thirty days but by June 2008, his performance declined to levels below the standards required by the PIP. (Def.'s Rule 56.1 Statement ¶ 50.)

### D. Maitland's Termination in the August 2008 RIF

On June 19, 2008, KMBS held a regional meeting, where it announced that it would implement a RIF to eliminate certain positions within the branch technical organizations. (Def.'s Rule 56.1 Statement ¶ 58.) Marra received instructions to eliminate two jobs from the Service Technicians in the Melville Branch. (Id. ¶ 59.) In response, Marra created a spreadsheet of employee performance, from January 2008 to July 2008, comprised of at least six categories of statistical data and other factors, including, *inter alia*, training and certification obtained, disciplinary letters, and the 2008 annual performance ranking. (Id. ¶¶ 59–60.)

At some point in July 2008, prior to when Marra finalized his spreadsheet, Maitland was given his annual performance rating: he received a rating of Less Than Expected ("LE"), the lowest possible performance rank.  (Id. ¶ 55.)  On July 22, 2008, KMBS issued Maitland a Letter of Concern regarding his failure to improve his performance and his failure to report to work on time.[3]  (Id. ¶ 56; Letter of Concern ("Letter of Concern") dated July 22, 2008, ECF No. 153.3, Ex. No. 23.)  Both the LE rating and the Letter of Concern were incorporated into the performance spreadsheet, which Marra finalized on July 23.  (Def.'s Rule 56.1 Statement ¶ 63.)

On the spreadsheet, out of twenty-eight technicians for the Melville Branch, Maitland was ranked second to last.  (Def.'s Rule 56.1 Statement ¶ 62; Branch Performance Spreadsheet, ECF No. 154.1, Ex. No. 20.)  Maitland was one of two technicians to receive an LE, the lowest performance rating. (Def.'s Rule 56.1 Statement ¶ 62.)  Maitland's mean copies between failure percentage was the lowest of the entire branch: 50.71%.  (Id.)  According to the spreadsheet, Maitland had not participated in training to work on newer models and was still performing below expectations, despite the PIP he had received in April 2008.  (Id.)  Additionally, he consistently arrived to work late and received a warning for improper use of his company cell phone in May 2008.  (Id.)

On July 23, 2008, Marra forwarded the spreadsheet to Paul Ambrose, the Regional Vice President of Technical Operations.[4]  (Id. ¶ 63; Email Anthony Marra to Paul Ambrose dated July 23, 2008, ECF No. 153.3, Ex. No. 10.)  KMBS finalized the decision to eliminate Maitland's position on July 29, 2008.  (Def.'s Rule 56.1 Statement ¶ 64; Manpower Reduction Worksheet dated July 29, 2008, ECF No. 154.1, Ex. No. 28.)  This decision was based on the information in Marra's spreadsheet.  (Marra Statement ¶ 23.)  The layoffs for the RIF were scheduled to occur

---

[3]  In July 2008, Maitland put in another request for a company car, which Marra denied.  (Marra Statement ¶ 6.)

[4]  Marra was fifty years old when he made the decision to terminate Maitland.  (Def.'s Rule 56.1 Statement ¶ 11.)

on August 6, 2008.  (Def.'s Rule 56.1 Statement ¶ 70; RIF Checklist attached to email dated Aug. 5, 2008, ECF No. 153.3, Ex. No. 10.)

On August 6, Maitland called in sick to work.  (Def.'s Rule 56.1 Statement ¶ 70.)  On August 7, Maitland was admitted to the hospital.  That same day, Yvonne Maitland called Marra to explain Maitland's hospitalization.  (Id. ¶ 73.)  While at the hospital Maitland made several attempts to fax KMBS a letter, dated August 7, in which Maitland states that if he were terminated, he would file discrimination and retaliation claims against the company.  (Letter dated Aug. 7, 2008, ECF No. 153.3, Ex. No. 31; Maitland Dep. at 312.)  It is unclear if and when Marra, or anyone else at KMBS, received the letter, but it is assumed that someone at KMBS did receive it.  (Def.'s Rule 56.1 Statement ¶ 82.)

KMBS planned to delay notifying Maitland until August 11, but he never returned to work.  (Id. at ¶ 73–75; Email from Anthony Marra to Steve Goldstein, et al, dated Aug. 8, 2008.)  On August 11, KMBS informed Maitland, by letter, that his position had been eliminated as part of the RIF.  (Def.'s Rule 56.1 Statement ¶ 75.)  In Maitland's branch, he and Blair Pryce, a fifty-three year old African-American man, were terminated.  (Dep. Anthony Mara ("Marra Dep.") at 58, ECF. No. 153.10, Ex. 4; Def. Resp. Pl.'s First Set Interrog., ECF No. 153.14, Ex. No. 39.)

## II. Discussion

### A.  Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986).  The movant

bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." Id. at 586 (citations omitted). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. See Shannon v. New York City Transit Auth., 332 F.3d 95, 99 (2d Cir. 2003) (citation omitted). The non-moving party must produce "significant probative evidence" demonstrating that a factual dispute does in fact exist, otherwise summary judgment is appropriate. Anderson, 477 U.S. at 249 (citation omitted).

In a discrimination case where intent is at issue, a "trial court must be cautious about granting summary judgment to an employer . . . ." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). Because direct evidence of discriminatory intent is rarely available, "affidavits and depositions must be carefully scrutinized for circumstantial proof

which, if believed, would show discrimination." Id. However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985)). "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact.'" Id. (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000)).

A *pro se* party's pleadings and briefs are liberally construed "to raise the strongest arguments they suggest." Hamlett v. Santander Consumer USA Inc., 931 F. Supp. 2d 451, 455 (E.D.N.Y. 2013) (quoting Bertin v. United States, 478 F.3d 489, 491 (2d Cir. 2007)). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Olle v. Columbia Univ., 332 F. Supp. 2d 599, 607–08 (S.D.N.Y. 2004) aff'd, 136 F. App'x 383 (2d Cir. 2005) (citations omitted).

**B.  Standard for Claims Under Title VII, the ADEA, the ADA, and NYSHRL**

Maitland alleges that KMBS discriminated against him in violation of Title VII based on his race, in violation of the ADEA based on his age, in violation of the ADA based on his bi-polar disorder, and in violation of the NYSHRL based on all grounds.  For all of these claims, the Court applies the three-step analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04 (1973) and its progeny.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506–10 (1993); Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–54 (1981).

Under this framework:  (1) a plaintiff must establish a prima facie case of discrimination; (2) after the plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its action; and (3) if the employer articulates such a reason, the burden then shifts back to plaintiff to prove, by a preponderance of

evidence, that the employer's stated reason is merely pretextual and that discrimination was the actual reason for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802–805; Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); Ruiz v. Cnty. Of Rockland, 609 F.3d 486, 491–492 (2d Cir. 2010); Russell v. Cnty. of Nassau, 696 F. Supp. 2d 213, 231 (E.D.N.Y. 2010).  "Evidence of pretext, however, even combined with the minimal showing necessary to establish a prima facie case . . . does not mandate a denial of summary judgment." Lizardo v. Denny's, Inc., 270 F.3d 94, 103 (2d Cir. 2001) (citation omitted).  Rather, the court "examine[s] the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." Id. at 101 (quoting Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (internal quotation marks omitted).

To establish a prima facie case of disability discrimination under the ADA, a plaintiff must show that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability."  McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013).  The Second Circuit has not yet definitively ruled on the causation standard for ADA claims.  See, e.g., Sherman v. County of Suffolk, 71 F. Supp. 3d 332, 348 (E.D.N.Y. 2014) ("[T]he question of whether the heightened, 'but-for' standard of causation for Title VII retaliation claims . . . applies to claims asserted under the ADA, is one that has not yet been addressed by the Second Circuit." (quoting Castro v. City of New York, 24 F.Supp.3d 250, 269 n.34 (E.D.N.Y. 2014))).  The Court assumes *arguendo* that plaintiff is required to show only that his disability was a motivating factor, and not a "but-for" cause, of the adverse actions at issue.

To establish a prima facie case of race or age discrimination under Title VII and the ADEA, the plaintiff must show that: (1) he belonged to a protected class or protected age group; (2) was qualified for the position he held; (3) plaintiff suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. Simmons v. Akin Gump Strauss Hauer & Feld, LLP, 508 F. App'x 10, 11 (2d Cir. 2013); Abdu-Brisson v. Delta Air Lines, Inc., 239 F. 3d 456, 466 (2d Cir. 2001).

The framework for analyzing plaintiff's race and age discrimination claims has only one material difference. For race discrimination claims, plaintiff must only prove that his race was a motivating factor behind the adverse action, Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008), whereas for plaintiff's age discrimination claim, he must prove that his age was the but-for cause for the adverse action. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009).

Discriminatory intent underlying a decision may be inferred from the totality of the circumstances, including historical background, sequence of events, and contemporary statements. Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown, 294 F.3d 35, 49 (2d Cir. 2002), superseded by statute on other grounds. However, "conclusory allegations of discrimination, absent any concrete particulars, are insufficient." Cameron v. Cmty. Aid For Retarded Children, Inc., 335 F.3d 60, 63 (2d Cir. 2003) (internal quotation mark omitted).

A plaintiff can show discriminatory intent by pointing to how defendant treated similarly situated employees differently than the plaintiff. Johnson v. Cty. of Nassau, 480 F. Supp. 2d 581, 597 (E.D.N.Y. 2007); Everson v. New York City Transit Auth., No. 02 Civ. 1121, 2007 WL 539159, at *21 (E.D.N.Y. Feb. 16, 2007) (citing Abdu-Brisson, 239 F.3d at 467. Plaintiff must demonstrate that the employees in question are similarly situated in all material respects, *i.e.*, that they were "subject to the same performance evaluation and discipline standards" with

comparable conduct.  <u>Johnson</u>, 480 F. Supp. 2d at 597 (quoting <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 40 (2d Cir. 2000).  Whether the compared employees are under the same supervisor is also relevant.  <u>Graham</u>, 230 F.3d at 39.

At the third stage of the <u>McDonnell Douglas</u> analysis, "the final burden rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual but also that the defendant discriminated against the plaintiff."  <u>Slattery</u>, 248 F.3d at 91.  "[A] reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason" for the employer's decision.  <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 515 (1993) (emphasis in original).  If plaintiff fails to "show that there is evidence that would permit a rational factfinder to infer that the employer's proffered rationale is pretext, summary judgment dismissing the claim is appropriate."  <u>Patterson v. County of Oneida</u>, 375 F.3d 206, 221 (2d Cir. 2004).  A plaintiff's disagreement with his employer's assessments does not prove that defendant's stated reason was pretextual.  <u>Del Franco v. New York City Off-Track Betting Corp.</u>, 429 F. Supp. 2d 529, 539 (E.D.N.Y. 2006) <u>aff'd</u>, 245 F. App'x 42 (2d Cir. 2007).  The trial court examines an employer's decision only for discrimination, and it does "not sit as a super-personnel department that reexamines an entity's business decisions."  <u>Delaney v. Bank of Am. Corp.</u>, 766 F.3d 163, 169 (2d Cir. 2014) (quoting <u>Scaria v. Rubin</u>, 117 F.3d 652, 655 (2d Cir. 1997)).

**C.  Application of the Standard for Discrimination**

Maitland claims he suffered several adverse employment actions because of KMBS's discrimination against him.  These alleged adverse actions include: excessive scrutiny of his performance, issuance of disciplinary letters in May 2008 and July 2008, denial of a company vehicle in October 2007 and July 2008, denial of vacation in April 2007, failure to increase his

salary in 2008, and his termination in August 2008. For the following reasons, defendant is entitled to summary judgment on all of these claims.

## 1. Termination

For his claims regarding his termination, Maitland alleges that KMBS discriminated against him based on his bipolar disorder, race, and age. KMBS primarily argues that on Maitland's prima facie case, Maitland cannot show an inference of discrimination, and, even if he could, he ultimately cannot meet his burden to show that his termination was discriminatory.

As noted above, plaintiff's burden to establish a prima facie case is minimal. Still, the Court doubts that Maitland can meet this burden. Assuming *arguendo* that Maitland could establish his prima facie case, he ultimately cannot show that his termination was based on his race, age, or disability.

KMBS has come forth with a legitimate, non-discriminatory reason for its decision. Specifically, KMBS asserts that Maitland was terminated as part of a RIF, for which he was selected because he was the second-lowest ranked employee on Mara's performance spreadsheet. As explained below, Maitland cannot show that KMBS's reason was a pretext for discrimination.

The evidence Maitland cites to show discrimination is flawed in numerous respects. Most importantly, Maitland faces an uphill battle to prove discrimination when Marra selected him for the RIF using, in large part, objective performance data.

### i. Plaintiff's Alleged Evidence of Pretext

As part of his efforts to establish pretext, Maitland disagrees with KMBS's assessment of his work and asserts that KMBS purposefully ignored white employees' inadequate performance, instead disciplining only African-American employees in a scheme to support Maitland's inclusion in the RIF. This theory, without evidence to support it, cannot save Maitland's case.

See Cruz v. Duane Reade Pharmacy Co., No. 03 Civ. 3418, 2005 WL 1251649, at *5 (S.D.N.Y. May 25, 2005) (finding that plaintiff's allegations of pretext were unsupported to the point where he would have to show that the proffered reasons were "so ridden with error that [Defendant] could not honestly have relied upon [them]") (quoting Lieberman v. Gant, 630 F.2d 60, 65 (2d Cir.1980) (alterations in original)).

Maitland points to his satisfactory performance before 2006 and the fact that he received annual raises until 2008.[5] However, in the year and a half leading up to his termination, Maitland's performance had noticeably declined, based on objective criteria for efficiency. In 2007, his performance was the lowest in his branch. Despite the Action Plan from December 2006 and the PIP from April 2008, Maitland ranked second to last in his branch on the date that KMBS selected employees for the RIF. Maitland raises no facts or evidence to show that KMBS's expectations were anything other than legitimate and non-discriminatory. See Workneh v. Pall Corp., 897 F. Supp. 2d 121, 133 (E.D.N.Y. 2012) (holding that plaintiff's "feeling" and personal opinion about the reasons behind defendant's alleged discrimination was insufficient to demonstrate an inference of discrimination).

Maitland complains that Marra monitored his performance more closely than that of other employees, called him during the day to check his whereabouts, and required only African-American employees to use a daily monitor log book. However, Maitland's only evidence of how other employees were treated is his own account of other employees' statements to him. (Maitland Dep. at 531–32.) That evidence is inadmissible hearsay. Furthermore, Maitland admits that Marra also called and checked on other technicians during the day. (Id.)

---

[5] Maitland also points out that Marra did not conduct any in-person performance evaluations for him between 2005 and 2008. (Marra Dep. at 24–25.) This is not evidence of discrimination. Marra testified that he missed the evaluations for other technicians during these years as well, and not just Maitland. (Id. at 26–27.)

Maitland attempts to question his performance metrics by pointing to evidence, including Marra's own testimony, indicating that the technicians' GPS system was not always working properly, which caused time stamps to be off by an hour during some portion of 2007 and 2008. (Marra Dep. at 52–53; Emails Anthony Marra to Technicians, ECF No. 153.12, Ex. No. 27.) This evidence is insufficient to cast doubt on the legitimacy of Maitland's performance metrics. Notably, nothing in the record suggests that the performance metrics were based exclusively—or even primarily—on GPS data. Nor is there any evidence that the other technicians, who experienced the same GPS glitches, were evaluated under any different standards than Maitland.

Maitland criticizes, to no avail, the July 2008 Letter of Concern and performance rating that he received in 2008. He argues that the numbers underlying the Letter of Concern were inaccurate, but offers no evidence to support that claim. He also attempts to justify his tardiness by claiming that he would take work home. (Maitland Dep. at 203–04.) However, his excuse does nothing to show that the Letter of Concern was discriminatory.[6] Maitland's evidence of his alleged satisfactory performance is nothing more than his own conclusory assertions that he knew he was doing a good job. Such evidence is insufficient to survive summary judgment. See Robinson v. Zurich N. Am. Ins. Co., 892 F. Supp. 2d 409, 430 (E.D.N.Y. 2012) ("It is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's . . . deficient performance, or even has evidence that the decision was objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination."). Maitland also claims that he was not previously informed that his performance

---

[6] As KMBS notes in its brief, given Maitland's poor performance on numerous objective performance statistics listed in the spreadsheet, it does not appear that the July 2008 Letter of Concern was critical to Maitland's ranking on Marra's performance spreadsheet.

was inadequate. This proposition is directly contradicted by, *inter alia*, the PIP that Goldstein discussed with him in April 2008.

In May 2008, Maitland received a Verbal Warning Letter for excessive use of his company cell phone after work hours for non-business purposes. (Def.'s Rule 56.1 Statement ¶ 51.) Although all the technicians averaged between 2,500 to 3,000 minutes per month, Maitland had averaged over 12,000 minutes for the prior three months. (Id.; Verbal Warning Letter for Edson Maitland, ECF No. 153.3, Ex. No. 24; Sprint Invoice, ECF No. 153.3, Ex. No. 25.) Maitland has no evidence suggesting that this letter, which was supported by cell phone records, was discriminatory. Maitland maintains that he did not use his phone any differently for those months but conceded that his son may have used his phone. (Def.'s Rule 56.1 Statement ¶ 53, Maitland Dep. at 352–53.) Maitland also alleges, without any proof, that the disciplinary letters he received were without cause and falsified to support his termination. Similarly, Maitland alleges that only African-American employees received disciplinary letters but points to no evidence of similarly-situated employees who engaged in comparable conduct without censure.

Finally, Maitland argues that Marra's performance spreadsheet intentionally placed minority employees at the bottom of the list. Although the three employees at the bottom of the spreadsheet were African-American, Maitland offers no admissible evidence to support his theory. For example, there is no evidence that the employees who were retained were similarly-situated but worse performers. As stressed previously, a substantial part of the rankings in Marra's spreadsheet was based on objective data. Maitland's alleged evidence of pretext is insufficient.

*ii. Plaintiff's Alleged Evidence of Age Discrimination*

The only evidence that Maitland proffers in support of his age discrimination claim is that a handful of workers, that he believed looked younger, were not terminated as part of the RIF. Maitland, however, offers no other details about those workers or their performances. This is clearly insufficient to show age discrimination. See Ugactz v. United Parcel Serv., Inc., No. 10 Civ. 1247, 2013 WL 1232355, at *16 (E.D.N.Y. Mar. 26, 2013) (citing Rosario v. Hilton Hotels Corp., 476 F. App'x 900, 902 (2d Cir. 2012) (summary order)) (collecting cases). Moreover, "[a] well-recognized inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class." Drummond v. IPC Int'l, Inc., 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005). Here, Marra was fifty at the time of RIF, further undercutting any claim of age discrimination. Furthermore, Maitland's position was not filled after the RIF, no new hires were made immediately before the RIF, and no one hired several months before the RIF assumed Maitland's duties. The absence of such evidence further supports granting summary judgment on Maitland's age discrimination claim. See Sundaram v. Brookhaven Nat. Labs., 424 F. Supp. 2d 545, 577 (E.D.N.Y. 2006) (finding no inference of discrimination arose when plaintiff failed to show that the employees hired seven months before his dismissal took on any his duties). Consequently, Maitland has failed to establish a claim of age discrimination.

*iii. Plaintiff's Alleged Evidence of Disability Discrimination*

KMBS asserts that the sequence of events fails to show an inference of discriminatory intent and also argues that it learned of Maitland's bipolar disorder on August 7, 2008, after the decision to terminate him had already been made. Because Yvonne Maitland asserts that she told

Marra of Maitland's bipolar disorder in 2006, there is a disputed issue of fact as to whether KMBS received notice.

Assuming KMBS had notice of his bipolar disorder, Maitland has still failed to show an inference of disability discrimination. To support an inference of discrimination, Maitland indicates that KMBS informed him of his termination on August 11, 2008, four days after it learned of his hospitalization. This argument fails because the evidence, including emails from July 2008, shows that the decision to terminate him occurred prior to his hospitalization.

The Court notes the sequence of events following Maitland's September 2006 leave, when Maitland was hospitalized and his wife first informed Marra about Maitland's bipolar disorder. Maitland received his first formal notice about poor performance, the Action Plan, in December 2006, not long after he returned he returned to work from leave. However, the timing of the Action Plan is insufficient to establish that the reasons given by KMBS for Maitland's termination in 2008 were a pretext for disability discrimination. Trent v. Town of Brookhaven, 966 F. Supp. 2d 196, 206 (E.D.N.Y. 2013) ("Temporal proximity may be sufficient to show a prima facie case, but it is insufficient to demonstrate pretext."), reconsideration denied, No. 08 Civ. 3481, 2014 WL 1757512 (E.D.N.Y. Apr. 30, 2014).

As explained above, Maitland's ranking and the criticisms of his performance are supported by objective performance data. Moreover, Marra's RIF decision was based on Maitland's performance and conduct in 2008, without any evidence suggesting that the 2006 Action Plan was considered. Finally, Maitland agreed that neither KMBS nor any of its managers took any action against him related to his 2006 leave. He has failed to establish a claim of discriminatory termination based on his disability.

*iv. Plaintiff's Other Alleged Evidence of Race Discrimination*

Maitland's remaining argument is that prior to his termination, Marra discriminated against him in 2007 and 2008, when Marra denied his request for a company vehicle. Maitland contends that this discrimination—which he also alleges is a discrete adverse action—is evidence that that his termination was discriminatory. As explained *infra*, Maitland cannot show that the denial of his vehicle request was discriminatory. Accordingly, this allegation cannot help him establish that his termination was discriminatory. His claim of discriminatory termination based on race fails.

**2. Denial of a Company Vehicle as Discrimination Based on Race**

Maitland asserts that KMBS discriminated against him based on his race when it denied his requests for a company vehicle in 2007 and 2008. In October 2007 and July 2008, Maitland experienced problems with his car and asked Marra for a company vehicle to travel between customers. (Marra Statement ¶ 6.)

KMBS reimburses technicians per mile for using their own vehicles and has a policy to provide eligible employees with company vehicles. (Id. ¶ 7.) To be eligible, an employee must, *inter alia*, drive a minimum 12,500 business miles per year and perform at the level "At Expectations" or higher. (KMBS Company Vehicle Program Policies and Procedures ("Vehicle Policy") ¶ B, ECF No. 153.3, Ex. No. 41.) A technician must request a company vehicle; he would not receive one automatically. (Def.'s Rule 56.1 Statement ¶ 101.) According to Marra, under the Vehicle Policy, an employee would qualify for a vehicle based on his mileage from the year prior to making the request. (Marra Statement ¶ 9.) The Vehicle Policy states an employee would demonstrate mileage by either his own submission of the miles he logged[7] or by producing the prior year's certificate "that the car has been or will be driving 12,500 annually."

---

[7] All technicians keep track of their own mileage to receive reimbursement. (Def.'s Rule 56.1 Statement ¶ 100.)

(Vehicle Policy ¶ D.)  Marra explained that because mileage may vary by year, once a technician qualifies, he may participate during a year in which his mileage falls below the threshold.  (Marra Statement ¶ 9.)  However, he would not be eligible to participate upon renewal.  (Id.)

When Maitland requested a car in October 2007, Marra responded, in an email, that Maitland could not receive a vehicle when his mileage did not meet the threshold.  (Email Anthony Marra to Edson Maitland dated Oct. 23, 2007, ECF No. 153.3, Ex. No. 35.)  In the email, Marra erroneously states that required threshold is 15,500 miles, not 12,500 miles, as stated in the Vehicle Policy.  (Marra Dep. at 21–22.)  Maitland alleges he continued to request a car throughout the summer of 2008.  The record demonstrates that Maitland's mileage was 10,966 miles, from the beginning of July 2007 to the end of June 2008.  (Edson Maitland Annual Business Mileage Records, ECF No. 153.13, Ex. No. 32.)

Maitland argues that from August 2007 to August 2008, he had more mileage than several white employees who had company vehicles.  However, Maitland ignores that the Vehicle Policy requires a technician to log 12,500 miles in the year prior to his request.  The company records that Maitland cites merely show the number of miles driven by employees in their company vehicles between August 2007 and August 2008.  (Resp. Pl.'s Supplemental Req., ECF No. 153.13, Ex. No. 31.)  These records do not show the mileage that employees had previously logged on their own cars, or in company vehicles, that would have made them eligible for the vehicle program.  Moreover, Maitland does not point to any evidence showing white employees that fell below the mileage threshold, applied for renewal, and retained their cars the following year.

Maitland's remaining argument is that Marra's misstatement of the mileage threshold is evidence of discrimination.  However, Marra's erroneous statement of the threshold is

insufficient because, *inter alia*, Maitland logged only 10,996 miles and conceded that he fell short of the 12,500 mark required by the Vehicle Policy. Therefore, summary judgment is granted for Maitland's discrimination claim based on denial of a company vehicle.

### 3. The Remaining Alleged Adverse Employment Actions

Maitland also alleges other discrete adverse employment actions that resulted from discrimination based on his race. As addressed above, Maitland's claims for discrimination based on excessive scrutiny and his disciplinary letters do not survive summary judgment. For his remaining claims, Maitland alleges he was denied a vacation in April 2007 and a salary increase in 2008.

To establish his prima facie case, the plaintiff must show that he suffered an adverse employment action, which is "a materially adverse change in the terms and conditions of employment." Batchelor v. City of New York, 12 F. Supp. 3d 458, 470 (E.D.N.Y. 2014) (quoting Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008). The action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Id. (quoting Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (internal quotation mark omitted)). "Classic examples . . . include termination of employment or demotion indicated by diminution in wage, less distinguished title, material loss of benefits and significantly diminished material responsibilities." Morrison v. Potter, 363 F. Supp. 2d 586, 590 (S.D.N.Y. 2005).

KMBS's denial of Maitland's request to take a week of vacation in April 2007 is not an adverse employment action. In April 2007, Maitland requested approval to take vacation time for later that month. (Def.'s Rule 56.1 Statement ¶ 93.) Marra denied Maitland's request because it was made "last minute" and because service levels would be affected, since other technicians were already scheduled to be on vacation or at training. (Id. ¶¶ 93–94.) KMBS

asserts that it does not grant every vacation request and that it has a policy of denying requests, if not placed in advance and if in conflict with business needs. (Id. ¶¶ 92, 95.) Denial of a preferred vacation time, distinguishable from denial of vacation time altogether, is not actionable. Batchelor, 12 F. Supp. 3d at 470 (E.D.N.Y. 2014) ("[T]he denial of a single vacation request, without any indication that there was an absolute prohibition against [P]laintiff taking any vacation time, is not a material adverse employment action." (second alteration in original)). Maitland has not argued that he was never allowed vacation. In fact, he took a scheduled vacation in September 2006. He also produced no evidence that the company's vacation policy was applied in a discriminatory fashion. This claim fails.

Finally, Maitland cites his lack of a salary increase in 2008 as an adverse employment action.[8] Although this is an adverse action, there is nothing in the record to support an inference of discrimination related to the lack of a raise in 2008. The mere fact that Maitland previously received annual raises is not enough, particularly given the deficiencies in Maitland's performance in 2008.

The Court has considered the rest of Maitland's claims and finds them meritless.[9] Therefore, summary judgment is granted as to Maitland's discrimination claims.

---

[8] As noted earlier, Maitland points out that Marra failed to provide him with in-person performance reviews between 2005 and 2008. He does not claim that this failure was an adverse employment action. There is also nothing in the record to show that the missed performance evaluations were adverse employment actions, considering that Maitland's performance had been well-documented through other means. See Cotterell v. Gilmore, 64 F. Supp. 3d 406, 424 (E.D.N.Y. 2014) motion to certify appeal denied, No. 12 Civ. 3808, 2015 WL 6550761 (E.D.N.Y. Oct. 27, 2015) (finding that supervisor's failure to meet with plaintiff for evaluation's did not rise to the level of an adverse employment action).

[9] Maitland alleges "express accusations of lying" as an adverse employment action, but it is unclear to what he refers and how it would constitute a materially adverse change.

**D. Retaliation**

Maitland contends that KMBS terminated him in retaliation for his August 7, 2008 letter, which stated that he intended to file a discrimination claim and then a retaliation claim if he were terminated. Retaliation claims are addressed using the <u>McDonnell Douglas</u> framework. <u>Bucalo v. Shelter Island Union Free Sch. Dist.</u>, 691 F.3d 119, 129 (2d Cir. 2012) (addressing Title VII and ADEA retaliation claims); <u>Bowen–Hooks v. City of New York</u>, 13 F. Supp. 3d 179, 219 (E.D.N.Y. 2014) (addressing Title VII and NYSHRL retaliation claims). For a prima facie case of retaliation, a plaintiff must establish: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" <u>Bucalo</u>, 691 F.3d at 129 (2d Cir. 2012) (quoting <u>Jute v. Hamilton Sundstrand Corp.</u>, 420 F.3d 166, 173 (2d Cir. 2005)).

Maitland's retaliation claim fails primarily on the fourth element: there is no causal connection between his letter, written in August 2008, and his termination, decided in July 2008. As described above, Marra selected him for the RIF almost a month before he wrote his letter. There can be no causal connection when the alleged protected activity occurred after to the alleged retaliation. Summary judgment is granted on the retaliation claims.[10]

**E. Interference and Denial of FMLA Leave**

Maitland alleges interference and retaliation claims for FMLA leave, related to his August 2008 hospitalization, because he received his letter of termination while he was hospitalized. For a prima facie case for interference with FMLA rights, the plaintiff must establish that he is an eligible employee and that the defendant is an employer under the FMLA;

---

[10] Even if Maitland had made out his prima facie case, the Court addressed above that KMBS has successfully met its burden on the second prong of <u>McDonnell Douglas</u> and that Maitland failed to show pretext.

he was entitled to FMLA leave; he gave the defendant notice of his intention to take leave; and defendant denied or otherwise interfered with benefits to which he was entitled under the FMLA. Casseus v. Verizon N.Y., Inc., 722 F. Supp. 2d 326, 336 (E.D.N.Y. 2010). A prima facie case for retaliation requires plaintiff to show not only that he exercised rights protected under the FMLA and that he was qualified for the position, but that he also suffered an adverse employment action that occurred under circumstances giving rise to an inference of retaliatory intent. Potenza v. City of New York, 365 F.3d 165, 168 (2d Cir. 2004). The McDonnell Douglas framework is applicable to the retaliation claim.

Based on the sequence of events, Maitland has failed to show that he gave notice to KMBS that he intended to take leave or that KMBS attempted to interfere with any leave.[11] Neither Maitland nor his wife ever communicated his intention to take leave, prior to his termination. Additionally, it is undisputed that Maitland successfully took FMLA leave in 2006 without any repercussions. Maitland's claim for retaliation based on FMLA leave fails for the same reasons.[12] Consequently, KMBS's motion with respect to Maitland's FMLA claims is granted.

---

[11] As previously discussed, on August 7, 2008, when Yvonne Maitland informed Marra that Maitland had been hospitalized, the decision to terminate his position had already been made. Therefore, there is nothing to show that Maitland's August 2008 hospitalization was considered in the July 2008 decision to include his position in the RIF. See Mathew v. N. Shore–Long Island Jewish Health Sys., Inc., No. 11 Civ. 6022, 2013 WL 5799883, at *10 (E.D.N.Y. Oct. 23, 2013) aff'd sub nom. Mathew v. N. Shore-Long Island Jewish Health Sys., Inc., 582 F. App'x 70 (2d Cir. 2014) ("[T]he FMLA does not guarantee employment." (citing Sista v. CDC Ixis N. Am., Inc., 455 F.3d 161, 176 (2d Cir. 2006))).

[12] And, even if Maitland could make out his prima facie case, KMBS articulated a legitimate non-discriminatory reason for which Maitland cannot demonstrate pretext.

**III. Conclusion**

The Court has considered plaintiff's remaining arguments and finds them meritless.  For the reasons set forth above, defendant's motion for summary judgment is granted.  The Clerk of Court is directed to enter judgment accordingly and close the case.

Dated:  January 25, 2016
Central Islip, New York

_____/s/_____(JMA)_____
JOAN M. AZRACK
UNITED STATES DISTRICT JUDGE